CORRADO BARBIERI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
BARBIERI v. COMMISSIONER
Docket No. 28611-88
United States Tax Court
T.C. Memo 1991-175; 1991 Tax Ct. Memo LEXIS 196; 61 T.C.M. (CCH) 2422; April 17, 1991, Filed *196 Decision will be entered for the respondent. Petitioner removed precious metals from his place of employment without authorization. Petitioner sold the precious metals in 1980 and 1981. Petitioner did not report the proceeds from these sales as income on his 1980 and 1981 Federal income tax returns. Petitioner filed an amended tax return for 1981 in which he reported additional income from these sales. Held: Petitioner is liable for the addition to tax pursuant to section 6653(b) for the taxable year 1981. Edward N. Lerner and Nancy Kostal, for the petitioner. Michael P. Breton, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Addition to tax
Year
Deficiency
[1] Section 6653(b) 1980
$ 11,686.64
$ 5,843.32
1981
2,252.70
7,282.00
Prior to trial, petitioner conceded the adjustments for *197 the taxable year 1980. After concessions, the remaining issue for decision is whether petitioner is liable for the addition to tax pursuant to section 6653(b) for the taxable year 1981. We hold that petitioner is liable for the addition to tax pursuant to section 6653(b) for the taxable year 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner, Corrado Barbieri, resided in Wethersfield, Connecticut, at the time his petition was filed. Petitioner was born on February 19, 1922, in Siracusa, Sicily, Italy. Petitioner graduated from an Italian high school/prep school in 1935. Petitioner is a citizen of the United States. In the early 1960's, petitioner was a self-employed barber. As a barber, Petitioner did not sell any products, but he knew that if he did, he would pay income tax on the profit. Petitioner became employed at Pratt & Whitney Aircraft Division, United Technologies Corporation (Pratt & Whitney) in 1965. Pratt & Whitney is a major Government defense contractor which manufacturers jet engines for the United States military. In the manufacturing *198 process, gold alloyed with other precious metals is used in the production of many of the component parts of these jet engines and jet engine parts. The gold alloyed with precious metals is in the form of paste, powder, tape, and preformed rings. During the production process for the jet engine and jet engine parts, the gold and precious metals are applied to certain component parts of the engines and engine parts. These parts are then brazed or soldered in a heat-treatment process in Department 524. During the brazing process, residue pieces of gold and precious metals are produced as a byproduct. These residue pieces harden into nuggets or buttons. Hereinafter when we refer to the term buttons, we mean the residue pieces of gold and precious metals. The buttons are swept up off the floor and placed in a trash can along with paper, Q-tips, and empty tubes. The trash can is placed in a furnace. All of the paper, Q-tips, empty tubes, and other materials are burned leaving a residue of metal. This metal is sent to a company which separates the precious metal from other residue metal in a reclaiming process. The precious metal is then shipped back to Pratt & Whitney. Petitioner *199 was employed as a vacuum furnace operator in Department 524 from approximately 1978 to 1984. Petitioner worked the second and third shifts. During the years 1980 and 1981, petitioner removed buttons from Pratt & Whitney. As a furnace operator, he was responsible for sweeping his floor area. He would pick up the buttons at this time. Petitioner removed one or two buttons a day from the shop over approximately a 3 year-period. Petitioner did not have the permission or authority to remove these buttons from Pratt & Whitney. He kept the buttons in a tin can in his home. Petitioner knew that the buttons had value and were not worthless scrap. Each new employee at Pratt & Whitney is given a company rule book and is told that he is responsible for the contents of the rule book. Each new employee also signs an employment agreement. John K. Leonard was a supervisor in the employment office for Pratt & Whitney in 1965 when petitioner was hired. Mr. Leonard gave petitioner a rule book after petitioner signed the employment agreement. At that time, Mr. Leonard did not go over the company rule book with petitioner. Mr. Leonard does not know whether or not petitioner ever read the *200 rules. However, it is the employee's obligation to understand and abide by the company rules. The rule book indicates that from time to time general notices would be posted on bulletin boards which are located throughout the factory. The rule book provides that each employee must read each notice promptly and carefully. The rule book indicates that guards will check all passes and inspect any packages an employee is carrying. The rule book also instructs each employee to sign an employment agreement. The employment agreement provides that each employee agrees to abide by all the rules and regulations of Pratt & Whitney and agrees that the posting of any rules and regulations on the bulletin boards of departments is a special and personal notice to each employee. On March 18, 1976, and November 17, 1978, general notices were posted listing general rules to be followed by employees. These notices provided that stealing and having in possession any property of Pratt & Whitney or attempting to remove packages or parcels without presenting a pass to the guard was forbidden. In addition to these general notices, Pratt & Whitney also posted Process Operation Procedure (POP) notices. *201 POPs were distributed to the foremen for dissemination. Joseph A. Bride was a general supervisor of Department 524 and 525 in 1980 and 1981. He was directly responsible for supervision of the first shift and indirectly responsible for supervision of the second and third shifts. Mr. Bride informed the foremen of the second and third shifts under his supervision of shop practices and POPs. POP 2175 outlined the procedure for reclaiming precious metals. POP 2175 was issued on March 10, 1981. Prior to POP 2175, the procedure for reclaiming precious metals was referred to as the normal shop practice. The normal shop practice in Department 524 where petitioner worked was that any buttons would be turned into the foreman or general foreman. Under POP 2175, all precious metal scrap had to be segregated from other types of scrap and such accumulated precious metal scrap had to be delivered to a department tool crib for reclamation. This included any quantity of alloy that could not be used to fabricate parts, all material used to assist in the application of precious metal in paste, and residue on work benches, floors, and tooling. Employees would either sweep or vacuum up this *202 material from the floor. Reclamation procedures were strictly enforced on the first shift. Mr. Bride did not know whether this practice was strictly enforced on the second and third shifts. Mr. Bride did not know whether petitioner had any knowledge of POP 2175. Mr. Bride received buttons from all three shifts. Also, it was common knowledge throughout Pratt & Whitney that employees were not allowed to remove company property or scrap material and that no employee would be issued a pass to remove buttons. Petitioner waited until the price of gold was high, and then he sold the buttons in 1980 and 1981 to J. M. Ney Company. J. M. Ney Company is engaged in the manufacturing of precious metals for use in the electronic and dental industries. In the Refining Division of J. M. Ney Company, precious metals are reclaimed for use in the manufacturing process. Patrick Davin was the assistant operations manager of J. M. Ney Company in 1980 and 1981. As assistant operations manager, Mr. Davin worked in the Refining Division and was responsible for the receipt of material sent in from customers and subsequent payment to customers for that material. Mr. Davin met with and purchased buttons *203 from petitioner. Petitioner told Mr. Davin that the buttons were from a brazing process used in his own machine shop. However, petitioner did not own a machine shop in 1980 or 1981. Petitioner was paid by check for the buttons. Petitioner knew that J. M. Ney Company was buying for the buttons in a sales transaction and was not giving him money as a gift. J. M. Ney Company kept records of its transactions with its customers. For 1980 and 1981, petitioner sold buttons to J. M. Ney Company on eight different occasions. The transactions for the year 1981 are as follows: Date materials
Date of
Precious metal      submitted
payment
recovered in ounces Amount
12/8/80 1/7/81
23.831 gold      $ 13,526.95
.527 silver      8.18
13,535.13
Refining charge  -218.29  Net to petitioner
$ 13,316.84
1/23/81 2/25/81
25.183 gold      $ 12,236.92
.656 palladium   74.78
$ 12,311.70
Refining charge  -237.61  Net to petitioner
$ 12,074.09
3/13/81 4/24/81
7.862 gold       $ 3,685.86 Refining charge  -87.90  Net to petitioner
$ 3,597.96 4/30/81 6/3/81
3.139 gold       $ 1,428.40 Refining charge  -50.11  Net to petitioner
$ 1,378.29 6/24/81 7/24/81
15.952 gold      $ 6,235.96 Refining charge  -152.62  Net to petitioner
$ 6,083.34 Total net to petitioner
$ 36,450.52 *204 Petitioner purchased stock and real estate with some of the proceeds from these sales. Petitioner is a cash basis taxpayer. During the taxable year 1980, petitioner received income in the amount of $ 31,002 from the sale of buttons to J. M. Ney Company. Petitioner failed to report the income from the sale of buttons on his original Federal income tax return for the taxable year 1980. Petitioner knew that this amount was not reported on his return. Petitioner fraudulently and with the intent to evade taxes omitted taxable income from his 1980 Federal income tax return. For the taxable year 1980, petitioner is collaterally estopped from disputing the civil fraud addition to tax pursuant to section 6653(b). (See page 11, infra.) Petitioner concedes the adjustments for the taxable year 1980. During the taxable year 1981, petitioner received income in the amount of $ 36,450.52 from the sale of buttons to J. M. Ney Company. Petitioner failed to report the income from the sale of buttons on his original Federal income tax return for the taxable year 1981. Petitioner knew that this amount was not reported as income on his return. Petitioner's 1980 and 1981 Federal income tax *205 returns were prepared by Joseph A. Emanuele who is a public accountant in Hartford, Connecticut. Mr. Emanuele prepared petitioner's Federal income tax returns for the taxable years 1956 through 1983. For the taxable years 1980 and 1981, petitioner failed to inform his return preparer, Mr. Emanuele, of petitioner's income from the sale of buttons. Petitioner has been buying and selling stock since 1966. Each year, petitioner's stockbroker at Buell Securities Corporation sent him a yearly summary of gains and losses from his stock account. During the year 1980, petitioner realized short- and long-term gains and losses from the sale of stock and from the sale of land in Florida in the net amount of $ 8,247. Petitioner failed to inform his return preparer, Mr. Emanuele, of these amounts, and he failed to report these amounts as income on his 1980 Federal income tax return. After petitioner was notified that his 1980 Federal income tax return was being audited, petitioner's former legal representative, Peter M. Conroy, Jr., On behalf of petitioner, filed an amended Federal income tax return (Form 1040X) for the taxable year 1981 which reported the additional income petitioner received *206 from the sale of metal and the sale of stock. This amended return reported the gain from the sale of metals in the amount of $ 36,451 which was the income petitioner received during the taxable year 1981 from the sale of buttons to J. M. Ney Company. By letter dated July 28, 1982, Mr. Conroy, on behalf of petitioner, enclosed a check in the amount of $ 15,258 to be applied to petitioner's 1981 Federal income tax liability. By letter dated October 27, 1982, Mr. Conroy, on behalf of petitioner, sent an unsolicited payment in the amount of $ 16,000 to the Internal Revenue Service auditor, Richard Geltzer, requesting that this amount be applied to petitioner's 1980 Federal income tax liability. On the amended return, the gain from the sale of buttons was treated as a short-term capital gain. This gain should have been reported as ordinary income. On the amended return, petitioner erroneously reported the sale of stock as a net short-term capital gain in the amount of $ 3,403. These transactions actually resulted in a net short-term capital loss in the amount of $ 3,403. In 1984 petitioner was discharged from his employment at Pratt & Whitney. In the case United States v. Barbieri, *207 (D. Conn. 1986), petitioner was charged by way of indictment with willful evasion of his Federal income tax liability in violation of section 7201 for the taxable years 1980 and 1981 and with theft of Government property. On November, 5, 1986, petitioner pled guilty to Count one of the indictment for income tax evasion in violation of section 7201 relating to the taxable year 1980. Count three charged petitioner with willful evasion of his Federal income tax liability for 1981. Counts two and four charged petitioner with violations of section 7206(1) for taxable years 1980 and 1981. Counts five through seven charged that petitioner did willfully and knowingly embezzle, steal, and convert to his own use precious metals which were the property of the United States. The District Court entered a judgment pursuant to the plea agreement. The remaining charges were dismissed. Petitioner was sentenced to 2 years in prison which was suspended after 90 days. He was placed on 2 years' probation and fined $ 10,000. Petitioner did not make restitution to Pratt & Whitney for the amount of buttons which he removed from the company. During the taxable years 1980 and 1981, petitioner failed *208 to maintain or submit for examination by respondent complete and adequate books and records of his income-producing activities as required by the Internal Revenue Code and the regulations promulgated thereunder. For the taxable year 1980, petitioner's failure to maintain complete and accurate records of his income and failure to produce complete and accurate records to respondent in connection with the examination of petitioner's income tax return was fraudulent and with the intent to evade tax. During the taxable years 1980 and 1981, petitioner earned as wages from his employer, Pratt & Whitney, $ 31,237 and $ 26,336, respectively, which he reported on his Federal income tax returns. On petitioner's 1980 Federal income tax return, he reported interest income from the Colonial Bank & Trust Company in the amount of $ 961 and dividend income in the amounts of $ 675 from AVCO, $ 540 from Mohawk Rubber Company, and $ 200 from Estherline Corporation. On petitioner's 1981 Federal income tax return, he reported interest income in the amount of $ 420 and dividend income in the amount of $ 2,702. Petitioner knew that his wage income from Pratt & Whitney was taxable income and that he *209 had to pay taxes on his dividend income, interest income, gain from the sale of his stock, and his self-employment income as a barber. In the notice of deficiency, respondent determined that petitioner received ordinary income of $ 31,002 from the sale of gold and silver in 1980, and that petitioner realized short- and long-term capital gain of $ 8,247.80 from the sale of stock and from the sale of land in 1980, all of which were not reported by petitioner on his return. Respondent also determined that on Schedule D, Form 1040X, filed for the taxable year 1981, petitioner incorrectly reported ordinary income of $ 36,451 from the sale of precious metals. Respondent determined that the underpayment of tax for the taxable years 1980 and 1981 was due to fraud and, consequently, petitioner was liable for the addition to tax pursuant to section 6653(b). OPINION Section 6653(b) imposes an addition to tax when the underpayment of tax is attributable to fraud. Respondent has the burden of proving by clear and convincing evidence that some part of the underpayment for the year in issue was due to fraud. Section 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). *210 To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Traficant v. Commissioner, 89 T.C. 501, 532 (1987), affd. 884 F.2d 258 (6th Cir. 1989); Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. 772 F.2d 910 (9th Cir. 1985); Rowlee v. Commissioner, supra at 1123. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96, 108 (1969). However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is *211 rarely available. Rowlee v. Commissioner, supra at 1123. Reasonable inferences may be drawn from the facts. Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, supra at 106. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, supra at 224; Otsuki v. Commissioner, supra at 106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Otsuki v. Commissioner, supra at 108. However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). Fraud may not be found under "circumstances which at the most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); *212 Katz v. Commissioner, 90 T.C. 1130 (1988). Other badges of fraud which may be taken into account include: The making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Petitioner's position is that he was unaware of the illegal nature of his activities and that he did not intend to steal from Pratt & Whitney. In the alternative, petitioner argues that even if he knowingly stole from Pratt & Whitney, his participation in an illegal activity and his failure to report such income are not indicative of a fraudulent intent to evade taxes. Petitioner argues that he has shown that he has a limited educational background and *213 a low level of sophistication with respect to taxes and with respect to his knowledge of Pratt & Whitney's reclamation procedures. According to petitioner, his actions are evidence of an intent to cooperate with the authorities. Petitioner argues that his failure to report the income from the sales of the buttons was not intentional. Petitioner maintains that he was careless and that he was unaware at the time he filed his tax returns that the proceeds constituted income. Petitioner argues that respondent has presented evidence of petitioner's negligence, but not evidence of fraud. The parties agree that for the taxable years 1980 and 1981, petitioner underpaid his taxes. We conclude that respondent has proven that this underpayment was due to fraud. First, petitioner understated his income in 1980 and 1981. Petitioner admitted that he received money from the sale of gold and that he knew these amounts were not reported as income. The amount of omitted income was substantial during those 2 years. Holland v. United States, supra; Fugger v. Commissioner, T.C. Memo 1985-14. There was a great discrepancy between the real net income *214 and reported income in 1980 and 1981. Rogers v. Commissioner, 111 F.2d 987 (6th Cir. 1940); Arlette Coat Co. v. Commissioner, 14 T.C. 751 (1950). Second, petitioner failed to maintain or submit for examination by respondent complete and adequate records of his income for the year in issue. Safra v. Commissioner, 30 T.C. 1026 (1958); Arlette Coat Co. v. Commissioner, supra; Slear v. Commissioner, T.C. Memo 1987-395. Third, petitioner concealed the income from the sales of the buttons. Petitioner failed to inform his return preparer of his income from the sales of the buttons, from the sale of his stock, and from the sale of real estate in 1980 and 1981. Vannaman v. Commissioner, 54 T.C. 1011 (1970); Nelson v. Commissioner, T.C. Memo 1987-369; Matthews v. Commissioner, T.C. Memo 1986-52. Fourth, petitioner gave implausible or inconsistent explanations of behavior. Petitioner's testimony was often inconsistent with his own testimony and with testimony of others. He misrepresented the source of the buttons to Mr. *215 Davis. Petitioner testified that he did not think there was anything wrong with taking the buttons or that there was any prohibition against taking the buttons. According to petitioner, he kept the buttons as souvenirs. However, it was common knowledge throughout Pratt & Whitney that employees were not allowed to remove company property or scrap material. Petitioner testified that he did not show the guards at Pratt & Whitney the buttons because he did not think about it. Petitioner testified that although he was employed at Pratt & Whitney for 19 years, he was not familiar with the company's pass system. However, he admitted that he knew that one of the reasons for checking the lunch boxes was to see if any Pratt & Whitney property was being removed from the premises. Petitioner testified that he did not know the buttons were worth much until he sold them. He also testified that he did not think the sale of gold was income and that he did not have to pay tax on the proceeds from the sale. He testified that he realized that he had to pay taxes on the proceeds from the sales of the buttons only when his lawyer instructed him to file the amended return. However, he also testified *216 that he knew that J. M. Ney Company was buying the gold from him in a sales transaction and was not giving him money as a gift. Petitioner testified that he knew that his wage income from Pratt & Whitney, his interest and dividend income, and his self-employment income as a barber, was taxable income. Petitioner was a self-employed businessman who knew that if he made a profit selling a product he would have to pay income tax on the profit. He also knew capital gain income is taxable and had substantial experience buying and selling stock. Long v. Commissioner, 12 B.T.A. 488 (1928); Nadell v. Commissioner, T.C. Memo 1974-227; Steinberg v. Commissioner, T.C. Memo 1962-108. Petitioner testified that he was not aware that Pratt & Whitney recovered the gold in the reclaiming process. However, the evidence indicates that Pratt & Whitney employees were notified of the reclamation procedure. Fifth, petitioner only cooperated with tax authorities after he learned that his 1980 income tax return was being audited. He filed an amended return for 1981 on the advice of his attorney. The fact that petitioner filed an amended *217 return in an attempt to correct an omission in the original return does not bar the imposition of the addition to tax for fraud. Benes v. Commissioner, 42 T.C. 358 (1964), affd. 355 F.2d 929 (6th Cir. 1966); Naples v. Commissioner, 32 T.C. 1090 (1959). Finally, petitioner's entire course of conduct reveals that he intended to defraud the Government. Petitioner was convicted for the evasion of his Federal income tax liability in violation of section 7201 for the taxable year 1980. A prior conviction of criminal tax evasion in which income was substantially understated is evidence of fraudulent intent with respect to the remaining year 1981. Farber v. Commissioner, 43 T.C. 407 (1965). Petitioner knowingly engaged in an illegal activity, the theft of gold, which is evidence of a disposition to defraud. McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Wells v. Commissioner, T.C. Memo 1983-788; Sullivan v. Commissioner, T.C. Memo 1983-539. Petitioner had a tin can full of buttons and waited until *218 the price of gold was high and then decided to sell the gold. Petitioner sold the buttons to J. M. Ney Company on eight different occasions in the 2-year period. The proceeds are income from an illegal activity. Lawson v. Commissioner, T.C. Memo 1989-351; Thompson v. Commissioner, T.C. Memo 1963-147, affd. 333 F.2d 845 (4th Cir. 1964). We have concluded that petitioner intended to evade his Federal income tax liability in the taxable year 1981 in failing to report the income from the sales of the buttons. Petitioner conceded the adjustments for the taxable year 1980. Accordingly, we hold that petitioner is liable for the addition to tax pursuant to section 6653(b) for the taxable year 1981. Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩